**Elizabeth DOLE, Secretary of Labor, United States Department of Labor, Plaintiff–Appellee,**

v.

**MR. W FIREWORKS, INC., Defendant–Appellant.**

No. 88–5574.

United States Court of Appeals, Fifth Circuit.

Nov. 16, 1989.

---

Norman B. Smith, Greensboro, N.C., L. Bruce Fryburger, San Antonio, Tex., for defendant-appellant.

Katherine Waldbauer, Linda Jan S. Pack, U.S. Dept. of Labor, Washington, D.C., Ronnie Howell, U.S. Dept. of Labor, Office of Sol., Dallas, Tex., for plaintiff-appellee.

Before GARWOOD, JONES, and SMITH, Circuit Judges.

GARWOOD, Circuit Judge:

This is yet another chapter in the ongoing battle between the Secretary of Labor (Secretary) and Mr. W Fireworks, Inc. (Mr. W) over the application of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* (FLSA), to the operators of Mr. W's roadside fireworks stands. The facts and earlier proceedings are set forth in detail in our opinion on the prior appeal in this case, *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042 (5th Cir.), *cert. denied*, 484 U.S. 924, 108 S.Ct. 286, 98 L.Ed.2d 246 (1987). However, a short summary is in order here. Mr. W is a closely held family-owned corporation that owns over one hundred roadside fireworks stands scattered across South Texas. The fireworks business is seasonal by nature, since Texas law permits fireworks sales only during two limited periods around New Year's Day and July 4. In the normal course of its business, Mr. W procures land, checks local fireworks ordinances, conducts market surveys, builds the stands, and transports them to their sites, where most remain throughout the year. It also procures licenses and insurance, purchases fireworks inventories, pays for electrical service to the stands, places advertisements in newspapers, and recruits operators for the stands.

These operators are the focal point of this ongoing dispute. In November 1983, the Secretary filed suit alleging that Mr. W had failed to compensate these operators as required by the minimum wage and overtime provisions of the FLSA. Mr. W countered by claiming that the operators were independent contractors, and thus not subject to the FLSA. The district court agreed, finding that the operators were independent contractors. In our prior decision, we reversed and held that the stand operators were employees of Mr. W. *Id.*, 814 F.2d at 1054. However, we remanded the case to the district court for consideration of Mr. W's claim that its operators/employees were otherwise exempt from the FLSA under the terms of that statute and, if not, for computation of the proper back pay award to those employees. On remand, the district court held that Mr. W was not otherwise exempt from the FLSA and awarded back pay totaling $225,423.61 plus interest. This appeal followed.

**Discussion**

I. *Exemptions to the FLSA*

Mr. W contends that its stand operators are exempt from the provisions of the FLSA under the "amusement or recreational establishment" exemption of 29 U.S.C. § 213(a)(3), as well as the "highly compensated administrative employees" exemption set forth in 29 U.S.C. § 213(a)(1). We find no merit in either argument.[1]

A. *Amusement or recreational establishment exemption*

Section 213(a)(3) of 29 U.S.C. provides that the minimum wage requirements of the FLSA do not apply to

"any employee employed by an establishment which is an amusement or recreational establishment, organized camp, or religious or nonprofit educational conference center, if (A) it does not operate for more than seven months in any calendar year, or (B) during the preceding calendar year, its average receipts for any six months of such year were not more than 33⅓ per centum of its average receipts for the other six months of such year...."

It is undisputed that Mr. W meets the "seasonality" requirement of this subsection. The only remaining question is whether Mr. W qualifies as an "amusement or recreational establishment." Unfortunately, this term is not defined in the statute, and the legislative history is far from clear.[2]

---

1. Mr. W also contended that its stand operators were exempt from the FLSA on the basis of the "outside salesmen" exemption (29 U.S.C. § 213(a)(1)). However, Mr. W has abandoned this argument on appeal.

2. We have previously noted that the task of interpreting the exemptions to the FLSA is made more difficult by the absence of a unifying principle underlying the exemptions, and that the exemptions seem to have been created mere-

We begin with the well-settled rule that courts should construe exemptions to the FLSA narrowly, and that the employer has the burden of proof to show that it is entitled to the exemption. *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 80 S.Ct. 453, 456–57, 4 L.Ed.2d 393 (1960). Our review of the record in the instant case convinces us that the district court did not err in determining that Mr. W failed to meet this burden. In our most recent decision concerning the "amusement or recreational establishment" exemption, we held that a marina that derived most of its income from boat, motor, and trailer sales did not qualify. *Brennan v. Texas City Dike & Marina, Inc.*, 492 F.2d 1115, 1119–20 (5th Cir.), *cert. denied*, 419 U.S. 896, 95 S.Ct. 175, 42 L.Ed.2d 140 (1974). Although we observed that the legislative history was "skimpy," we held that it did suggest the exemption was not intended to cover establishments whose sole or primary activity is selling goods. *Id.* at 1118.

Our decision in *Texas City Dike* also underscored the point that the exemption was designed solely for those establishments whose sales were intended for consumption in a "geographically delimited recreational area," *id.* at 1119.[3] Of the establishments that have qualified for the exemption (golf course pro shops, baseball parks, amusements parks, racetracks, summer camps, dry goods stores in national parks), each serves a well-defined area. *See id.* at 1119, nn. 10–14. Although it is possible for consumers to purchase goods at some of these establishments for consumption elsewhere (*i.e.*, golf balls purchased at a pro shop), sale for consumption elsewhere is not the establishment's primary purpose and usually will make up only a small fraction of its business.[4]

In *Texas City Dike*, we expressed our concern that permitting every seaside merchant to claim the exemption would result in the exemptions swallowing the rule. *Id.* at 1119. Mr. W concedes that the various other roadside stands common throughout Texas (*i.e.*, purveyors of fruit, vegetables, seafood, tamales, flags, bird houses, games, toys, portraits of Elvis on black velvet, etc.) are subject to the terms of the FLSA. Although Mr. W's products provide amusement, this fact does not distinguish Mr. W from the retailers of other seasonal and recreational items, such as fishing tackle, shot gun shells, or ski equipment. The district court could legitimately conclude that Mr. W had not shown that it was other than simply a retail merchant selling tangible personal property primarily for use by the purchasers at locations substantially removed from and functionally unrelated to the location of Mr. W's diverse roadside places of business. The Sixth Circuit noted in *Homemakers Home & Health Care Services v. Carden*, 538 F.2d 98, 101 (6th Cir.1976), that exemptions to the FLSA are to be "limited to those establishments *plainly and unmistakably* within [the FLSA's] terms and spirit" (emphasis added). While we might not put the matter quite so strongly, it is nevertheless clear the exemptions are to be strictly construed, with the burden being on the party asserting an exemption. We conclude that the district court did not err in determining that Mr. W had not established entitlement to exemption as "an amusement or recreational establishment."

### B. The administrative personnel exemption

Mr. W's second contention is that its stand operators are exempt under the "highly compensated administrative personnel" exemption of 29 U.S.C. § 213(a)(1). However, the district court, following our earlier remand, ruled against Mr. W on its

---

ly to ensure the FLSA's passage. *Brennan v. Texas City Dike & Marina, Inc.*, 492 F.2d 1115, 1117 (5th Cir.), *cert. denied*, 419 U.S. 896, 95 S.Ct. 175, 42 L.Ed.2d 140 (1974).

3. The *Texas City Dike* marina did not service such a limited area, since it catered to boaters and fishermen across a wide area of the Gulf of Mexico. *Id.* at 1120.

4. The prices at these establishments are usually well above the general retail prices for the same item, taking advantage of the consumer's immediate need for the product being sold as well as the absence of an alternative source.

claims for exemption from the FLSA on July 15, 1987, and Mr. W did not raise its "administrative personnel" claim until it moved to amend its answer under Fed.R. Civ.P. 15(a) on February 16, 1988, over seven months after the district court's earlier ruling. Mr. W waited even longer (until June 1, 1988) to move to amend its answer to conform to the evidence under Fed.R.Civ.P. 15(b), and did so only as an additional effort to claim the "administrative personnel" exemption. The district court denied both motions.

■ Regarding Mr. W's Rule 15(a) motion, we note that the standard of review for a decision to grant or deny leave to amend is whether the district court abused its discretion. *Henderson v. United States Fidelity & Guaranty Co.*, 620 F.2d 530, 534 (5th Cir.), *cert. denied,* 449 U.S. 1034, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980). We find no abuse of discretion here. Although the language of Rule 15(a) states that leave to amend "shall be freely given when justice so requires," justice does not so require in the instant case. Mr. W's motion, pared to its fundamentals, is simply an effort to try the matter of exemptions once more, and the district court did not abuse its discretion in refusing this request.

■ Mr. W's claim under Rule 15(b) is equally meritless. While it is correct in its argument that an issue is treated as if it were raised in the pleadings if the parties consented to try the issue, *Metropolitan Life Ins. Co. v. Fugate*, 313 F.2d 788, 795 (5th Cir.1963), there is no indication that the Secretary actually consented to try the issue of "highly compensated personnel" in the present case. The evidence that Mr. W alleges to have shown *implied* consent was also relevant to the other issues at trial and cannot be used to imply consent to try the present issue. *Jimenez v. Tuna Vessel "Granada,"* 652 F.2d 415, 421 (5th Cir. 1981). No good cause was established for the distinctly belated raising of the "highly compensated personnel" exemption claim and the district court did not abuse its discretion in denying it.

## II. *Damages and the "cash advances"*

■ We now address the issue of damages. The district court ordered Mr. W to pay the stand operators the sum of $225,-423.61 plus interest as back pay.[5] However, Mr. W contends that it made "cash advances" to the operators/employees amounting to nearly $160,000, and that the Secretary wrongfully credited it with only half this amount. Mr. W argues that the district court erred in not also deducting this $80,000 (the portion of the $160,000 "cash advances" for which the Secretary did not give credit) from the total back pay award.[6]

It is first necessary to explain the term "cash advances," for in the context of this case it does not refer to advances in the traditional sense of that word, but instead refers to a particular aspect of Mr. W's system for compensating the stand operators. At the beginning of the sales season, each operator receives a quantity of inventory. At the end of the season, any remaining unsold inventory is returned to Mr. W. The dollar value of the ending inventory, based upon the suggested retail price, was then subtracted from the dollar value of the total deliveries from Mr. W to that particular stand. This difference is presumed to have been sold by the operator. For instance, if an operator begins with $10,000 worth of fireworks and returns $3,000 worth at the end of the season, that particular stand has presumed

---

**5.** The Secretary computed the unpaid minimum wages and overtime to total $260,063.69. As requested by Mr. W, the district court deducted $15,889.78 on the basis that the operators owed Mr. W this amount, and also deducted $18,-750.30 based on the two year statute of limitations because Mr. W's violations had not been willful (29 U.S.C. § 255 provides a two year statute of limitations for nonwillful violations. *See McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988)).

The Secretary challenges neither of these deductions on appeal.

**6.** Mr. W also contended that it was entitled to a deduction of approximately $60,000 as an "exclusion of ten (10) hours as off-duty time." However, the district court rejected this argument and Mr. W does not contest that ruling here.

sales of $7,000. Mr. W calculates each stand's commission from this figure. In our hypothetical, the operator's commission would equal fifteen percent of the $7,000 presumed sales, or $1,050. However, Mr. W does not simply issue a check for this $1,050. While operators are generally expected to turn over all cash received to Mr. W (which should, in theory, equal the amount of presumed sales),[7] not all operators do so.[8] For instance, in our example, the operator may turn over only $6,500. The difference between the presumed sales ($7,000) and the amount actually turned over ($6,500) is the amount considered to be the "cash advance." In our illustration, this "cash advance" equals $500. When Mr. W pays the commission due (here, $1,050), it subtracts the "cash advance" from the total commission. Here, Mr. W would pay our hypothetical operator $550 in respect to his commission ($1,050 total commission less $500 "cash advance").

In making its initial calculations, the Secretary disallowed one-half of each operator's cash advance across the board and without any individualized consideration. The district court accepted the Secretary's figures. However, the evidence in the record indicates that this was clearly erroneous. Many of the operators' "settlement sheets" include notations stating that the operators had taken the entire permitted cash advance for their own use.[9] For instance, of the more than ninety settlement sheets for the 1987 summer season, all but seven contained such notations. Although these notations were apparently prepared by Mr. W, nothing in the record positively

states this fact, and even if they were prepared by Mr. W, the district court made no direct (or even implied) statement that would indicate that these notations lacked credibility. Furthermore, Mr. W also introduced acknowledgements, signed by the operators themselves, that the operators had taken the cash advance money. These acknowledgements said:

"I, (operator), ran a Mr. W Fireworks, Inc. stand at (location) the season of (season). On my settlement sheet the (amount) of advances reflects (amount) that I took out of the cash receipts for my personal use or labor or expenses."

Although these acknowledgements state that the money was taken for "personal use or labor or expenses," we held in our prior opinion that the expenses in running the stands (*i.e.*, general maintenance, purchase of hay to cover muddy areas in front of the stands, etc.) were indisputably minimal. *Id.*, 814 F.2d at 1048–49. Regarding the other two allocations (personal use or labor), Mr. W is entitled to credit for both. It is undisputed that Mr. W is entitled to receive credit for money taken by the operators for their own personal use, and also that Mr. W is entitled to credit for money used by the operators to pay for assistants, because the pay due to these assistants was factored into the Secretary's initial calculations. Because it was error for the district court to simply accept the Secretary's initial figures at face value, given the record evidence, we reverse the back pay award and remand for further proceedings consistent with this opinion.[10]

7. For purposes of this hypothetical, we will ignore state sales taxes.

8. In fact, some operators took their entire commissions out of the sales receipts before the end of the sales season with the intent that Mr. W would owe them nothing at the time it paid the final commissions. Mr. W did not object to this practice, as long as the operators did not withdraw funds in excess of their commissions.

9. This notation reads as follows: "[A]mount of advances representing cash which operator acknowledges withdrawing for its own use [amount filled in]."

10. On the basis of the evidence adduced at the May 4, 1988 back pay hearing, it appears that

the cash advance money may be allocated roughly (and given the general lack of record keeping by both Mr. W and the operators, we stress "roughly") in the following manner:

| Expense | Percent |
| --- | --- |
| Personal Use | 17 |
| Pay to Assistants | 35 |
| Stand Improvements | 3 |
| Unspecified | 45 |

While the idea of splitting the advance money fifty-fifty has some appeal, under the record and extant findings this method of division could not properly be applied except possibly to that portion of the advance the use of which was not shown. On the basis of the above percentages, this means that the court should have permitted

For the foregoing reasons, the judgment of the district court is

AFFIRMED in part, REVERSED in part, and REMANDED.

the Secretary to disallow no more than approximately one-quarter of the total cash advance figure, rather than one-half. However, we do not mandate that the district court rigidly apply these numbers on remand. Since the court

made no findings regarding the credibility of the settlement sheet notations or the operators' signed acknowledgements, the amount disallowed may well be less than the one-quarter discussed above.