USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 95-1624 UNITED STATES, Appellee, v. THOMAS BARTELHO, Defendant - Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. D. Brock Hornby, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Stahl and Lynch, Circuit Judges. ______________ _____________________ Christopher W. Dilworth, by Appointment of the Court, for ________________________ appellant. Margaret D. McGaughey, Assistant United States Attorney, ______________________ with whom Jay P. McCloskey, United States Attorney, and Richard _________________ _______ W. Murphy, Assistant United States Attorney, were on brief for _________ appellee. ____________________ December 5, 1995 ____________________ TORRUELLA, Chief Judge. Defendant-appellant Thomas TORRUELLA, Chief Judge. ____________ Bartelho ("Bartelho") challenges his conviction for possession of a firearm by a convicted felon under 18 U.S.C. 922 and 924. After a jury trial in the United States District Court for the District of Maine, Bartelho was sentenced on May 26, 1995 to 120 months incarceration. We affirm his conviction. I. BACKGROUND I. BACKGROUND Viewed in the light most favorable to the government, United States v. Robles, 45 F.3d 1, 2 (1st Cir.), cert. denied, _____________ ______ ____________ 115 S. Ct. 1416 (1995), a reasonable jury could have found the following facts. At about 9:20 a.m. on Saturday, July 2, 1994, the Windham Police Department received a call from Lori Daigle ("Daigle"), the resident of the first floor apartment in a two- unit residence on Route 115 in Windham. Daigle reported an ongoing disturbance in the upstairs unit. Bartelho, who lived with his girlfriend Patricia Harris ("Harris") and their two young children, rented that apartment (the "Harris-Bartelho apartment"). Daigle stated to the dispatcher that one of her upstairs neighbors, Harris, had complained to her at 2:00 a.m. of being assaulted by her boyfriend, identified then as "Tommy." Daigle also told the dispatcher that Harris had asked her to take her to the hospital. Furthermore, Daigle reported that Harris expressed fear for her 18-month-old child, and that "Tommy" had chased her down the road with a loaded rifle. Daigle also -2- -2- explained to the dispatcher that she had not heard the boyfriend leave, and so he must still have been upstairs. Four Windham police officers were dispatched to the scene. Meanwhile, dispatcher John Perruzzi tried to reach Harris by phone in the Harris-Bartelho apartment. Finding the line busy, he had the phone company break in, and upon reaching Harris, convinced her to walk out of the building to talk with the officers waiting outside. Harris spoke to Sergeant David Thomas and Officer Raymond Williams. Officer Williams told Harris that the police were responding to a report that she had been assaulted and threatened with a firearm. Harris answered that she had had an argument with her boyfriend but that he had left 30 minutes previously. The officers observed that Harris' eyes were puffy, that she appeared nervous, and that she would not make eye contact with them. In accord with their domestic violence training, the officers concluded that Harris was protecting Bartelho, possibly out of fear of reprisal. In view of Daigle's report, they did not believe Harris' statement, and instead asked for her permission to enter the Harris-Bartelho apartment, which she denied. Sergeant Thomas then told Harris that the officers would enter the apartment without her permission. Several factors persuaded the officers to conduct a warrantless search, including their belief that Harris was lying to protect Bartelho, Daigle's statement that Bartelho remained in the apartment, the -3- -3- fact that Route 115 is a busy highway where the town's Fourth of July parade was about to begin, and the presence of other dwellings nearby. As they later testified, they concluded that if the defendant were allowed to remain in the apartment, a large number of people would be exposed to the risk of harm. Officer Williams and Sergeant Thomas climbed the stairway that led to the Harris-Bartelho apartment's main entrance. They entered the unlocked front door and searched the premises. Officer Williams checked the back porch, from which an enclosed stairway leading to the ground level constituted a second escape route from the apartment. Officers on the ground watched both exits as the search took place. After Sergeant Thomas and Officer Williams failed to find the suspect in the apartment, Officer Williams checked the back porch more carefully, and noticed a loaded semiautomatic rifle on top of a stove on the porch. Officer Williams looked down the porch stairway, and called out the name "Tommy," whereupon Thomas Bartelho emerged from his hiding place below. On July 6, 1994, a warrant was executed authorizing a search of the Bartelho-Harris apartment for evidence of bank robbery. Part of the basis for the warrant was the FBI's belief that the weapon found during the earlier, warrantless search ("the July 2 search") was the same as the one that had been used in a series of bank robberies. Pursuant to the warrant, another search was conducted on July 7 ("the July 7 search"), which -4- -4- turned up additional items including a quantity of ammunition and a stock and case for a rifle. -5- -5- II. DISCUSSION II. DISCUSSION On appeal, Bartelho contends that four issues require that we overturn his conviction. First, he argues that the government failed to prove that his firearm civil rights had not been restored, as he asserts it was required to do. Second, he contends that the district court wrongly denied his motion to suppress evidence found during the July 2 and July 7 searches. Third, he claims that the district court's jury procedures were improper. Fourth, and finally, he asserts that the district court erred in allowing testimony that he threatened to kill Harris. A. Restoration of Felon Firearm Civil Rights A. Restoration of Felon Firearm Civil Rights Bartelho appeals his conviction under 18 U.S.C. 922(g)(1) (1994), which provides that it is unlawful for anyone "who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year . . . to possess . . . any firearm." Bartelho's last conviction before the instant crime was in 1990, when he served one year of a five-year prison sentence. As noted in the facts, the police discovered a semiautomatic rifle during their search of the Harris-Bartelho apartment in close proximity to the place where they also discovered defendant-appellant Bartelho, and at trial the government presented Harris' taped pretrial statement that Bartelho had threatened her while holding this weapon. According to Bartelho, the district court erred in denying his motion to dismiss, which contended (1) that the -6- -6- government was required to prove that his right to bear arms had not been restored by the State of Rhode Island, and (2) that the government failed to carry this purported burden. Bartelho reiterates this argument on appeal. The argument depends on his interpretation of 18 U.S.C. 921(a)(20) (1994), which defines the term "crime punishable by imprisonment for a term exceeding one year" in 922(g)(1) as follows: What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held. Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms. Bartelho argues that because Rhode Island has provided for possible restoration of his civil right to carry a firearm, to convict him under 922(g)(1), the government bears the burden of showing that such restoration has not occurred. In short, Bartelho proposes that we treat this showing as an element of the offense. We reject Bartelho's argument because we conclude that a showing that the right to carry a firearm has not been restored is not an element of a 922(g) violation. In United States v. _____________ Ramos, 961 F.2d 1003, 1006 (1st Cir. 1992), we read 922(a)(1) _____ to require proof of three elements: (1)that the accused is a convicted felon; (2)who knowingly possessed a firearm; -7- -7- (3)which was connected with interstate commerce. Id. at 1006; see also United States v. Flower, 29 F.3d 530, 534 __ ________ ______________ ______ (10th Cir. 1994) (citing United States v. Shunk, 881 F.2d 917, ______________ _____ 921 (10th Cir. 1989)); United States v. Sherbondy, 865 F.2d 996, _____________ _________ 1001-03 (9th Cir. 1988). While neither 921(a)(20) nor 922(g)(1) explicitly describes the role that the 921(a)(20) definition should play or specifies who must initially raise or ultimately bear the burden of proof on the issue of the predicate conviction's continuing vitality, we conclude that 921(a)(20) is merely a legal definition for the phrase "conviction for a term exceeding one year" in 922(g)(1). Indeed, the title to 18 U.S.C. 921 is "Definitions." Furthermore, 921(a)(20) begins with the words "[t]he term 'crime punishable by imprisonment for a term exceeding one year' does not include," and is followed by two exceptions. Thus, 921(a)(20) serves to narrow the class of prior convictions down to a smaller class of convictions that may serve as predicate convictions under 922(g)(1). To treat  921(a)(20) as a legal definition accords with the approaches taken explicitly by two other circuits, see United States v. ___ _____________ Jackson, 57 F.3d 1012, 1016 (11th Cir. 1995); Flower, 29 F.3d at _______ ______ 534; United States v. Clark, 993 F.2d 402, 406 (4th Cir. 1993), _____________ _____ and implicitly by several others, see United States v. Frushon, ___ ______________ _______ 10 F.3d 663, 665-66 (9th Cir. 1993); Martin v. United States, 989 ______ _____________ F.2d 271, 273 (8th Cir.), cert. denied, 114 S. Ct. 475, 126 ____________ -8- -8- L.Ed.2d 426 (1993); United States v. Cassidy, 889 F.2d 543, 545 ______________ _______ (6th Cir. 1990). We are persuaded by the approach of United States v. ______________ Flower. The significance of 921(a)(20)'s definitional nature ______ is that the trial judge bears the responsibility of determining as a matter of law whether a prior conviction is admissible in a 922(g)(1) case. Flower, 29 F.3d at 535. Under Bartelho's ______ proposed rule, the government would be required to refute every possibility that criminal defendants have had their prior convictions nullified or their civil rights restored. Rather than require the government to show a negative proposition, we reject Bartelho's interpretation. It is certainly much easier for criminal defendants to raise the issue of whether their prior convictions have been nullified or their civil rights otherwise restored. Id.1 __  ____________________ 1 We note in passing that the only circuit to have held that the government must prove the "continuing validity" of a defendant's previous conviction, United States v. Essick, 935 F.2d 28, 31 _____________ ______ (4th Cir. 1991), has recently clarified, and limited, their previous conclusion in a manner instructive for the present case. See United States v. Thomas, 52 F.3d 82, 85 (4th Cir. 1995); see ___ _____________ ______ ___ also United States v. Clark, 993 F.2d 402, 406 (4th Cir. 1993). ____ _____________ _____ In Thomas, the court limited Essick's holding, by ruling that it ______ ______ did not apply to circumstances where the underlying state law automatic restoration provision could not normally have taken effect because the defendant had a prior conviction falling within the statutorily prescribed period. Thomas, 52 F.3d at 85. ______ Bartelho urges that we follow Essick and adopt its original ______ holding. But Essick has been limited by the court that issued ______ it, and in such a manner that would not benefit Bartelho. Bartelho was most recently convicted only four years before the instant offense; Rhode Island law requires that ten years must pass after completion of a conviction before a defendant can initiate the expungement process by which Bartelho's civil right to carry a firearm could have been restored. See R.I. Gen. Laws ___ 12-1.3-2(a), 12-1.3-3(b)(1) (1956). Furthermore, while -9- -9- A claim of restoration of civil rights is in the nature of an affirmative defense. As a result, once a prior felony conviction and corresponding loss of civil rights is proven by the government, as with any other factual condition, the presumption is that that condition remains. See Jackson, 57 F.3d ___ _______ at 1016 ("[W]here affirmative defenses are created through statutory exceptions, the ultimate burden of persuasion remains with the prosecution, but the defendant has the burden of going forward with sufficient evidence to raise the exception as an issue.") (quoting United States v. Laroche, 723 F.2d 1541, 1543 _____________ _______ (11th Cir.), cert. denied, 467 U.S. 1245 (1984)). It is up to ____________ the defendant to raise the issue and produce evidence showing that changed circumstances make the original condition inapplicable. See Jackson, 57 F.3d at 1017; Flower, 29 F.3d at ___ _______ ______ 535. Defendant has not done so here. Thus, upon de novo review, see, e.g., United States v. __ ____ ___ ___ _____________ Three Juveniles, 61 F.3d 86, 87 (1st Cir. 1995) (reviewing de _______________ __ novo issues of interpretation of federal criminal statute), we _____ find no error of law, since the government was not required to show the validity of his past conviction in order to prove a violation of 922(g)(1). B. The Motion to Suppress B. The Motion to Suppress  ____________________ Bartelho contends that the government was required to show that he had not been pardoned, see R.I. Const. art. IX, 13, and ___ thereby had his civil rights restored, he cites no authority for this proposition other than Essick, which as noted above, ______ actually involved an automatic restoration provision, not a discretionary expungement or pardon. At any rate, we decline to adopt the rule that Bartelho proposes. -10- -10- With respect to the motion to suppress, we review a district court's findings of fact only for clear error. United ______ States v. Mart nez-Molina, 64 F.3d 719, 726 (1st Cir. 1995). ______ _______________ Questions of law, however, are subject to de novo review. Id.; _______ __ United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994).  _____________ ______ Prior to trial, Bartelho moved to suppress the evidence garnered in both the July 2 warrantless search and the July 7 search, which he contended was tainted by the use of July 2- obtained evidence to procure the warrant used. Based on the facts presented at the evidentiary hearing, the magistrate judge recommended that the district court deny Bartelho's suppression motion, and the district court did so. The district court found that (1) the officers had probable cause to believe that contraband or evidence would be found inside, and (2) exigent circumstances justified their entry without first obtaining a warrant. On appeal, Bartelho argues that the district court erred by ruling that the July 2 search and subsequent seizures were constitutionally protected. He contends that the evidence found in the July 2 search should be excluded because the police did not have probable cause to enter the apartment, and that there were no "exigent circumstances" to excuse their lack of a warrant. Furthermore, he argues that evidence gathered in the July 7 search constitutes "fruit of the poisonous tree" and should also be suppressed. See Wong Sun v. United States, 371 ___ ________ _____________ U.S. 471, 487-88 (1962). -11- -11- First, we address Bartelho's contention that there was insufficient probable cause to support the officers' entrance into the Harris-Bartelho apartment. Probable cause to conduct a search exists when "given all the circumstances, there is a fair probability that contraband or evidence will be found in the place described." United States v. Moore, 790 F.2d 13, 15 (1st _____________ _____ Cir. 1986), cited in United States v. Wilson, 36 F.3d 205, 208 ________ _____________ ______ (1st Cir. 1994). The determination of probable cause is to be made by evaluating the totality of the circumstances facing the police. See Illinois v. Gates, 462 U.S. 213, 238 (1983); United ___ ________ _____ ______ States v. Garc a, 983 F.2d 1160, 1167 (1st Cir. 1993). ______ ______ Bartelho argues that the police should not have been allowed to rely on Daigle's statement that he was still in the Harris-Bartelho apartment. He argues that because Daigle was in her apartment together with small children, she could not have known whether he had left via the back stairs, which were detached from the building and enclosed. Furthermore, Bartelho cites Harris' statement to the police that he was not in the building as evidence that they did not have probable cause. Bartelho's arguments are not persuasive. The district court was not required to accept the contention that the placement of the back staircase made it impossible for Daigle to know if Bartelho had left. The officers testified that Daigle was adamant that Bartelho was still there. Furthermore, the officers were not required to take Harris' statement at face value, especially given their domestic-abuse training. See, ___ -12- -12- e.g., United States v. Taylor, 985 F.2d 3, 6 (1st Cir. 1993) ___ ______________ ______ (weighing officers' experience in determination of probable cause); see also United States v. Henry, 48 F.3d 1282, 1284-85 ________ _____________ _____ (D.C. Cir. 1995) (upholding protective sweep despite the fact that girlfriend told police her boyfriend had left). We conclude that the evidence regarding the totality of the circumstances supported the district court's conclusion that probable cause existed for the police to believe Bartelho was still present in the apartment, and we find no clear error. See United States v. ___ _____________ Wilson, 36 F.3d 205, 209 (1st Cir. 1994) (reviewing district ______ court's factual findings, especially witness credibility determinations, for clear error); United States v. Baldacchino, ______________ ___________ 762 F.2d 170, 175 (1st Cir. 1985). Second, we address the critical limitation that "[e]ven when supported by probable cause, warrantless entries into a person's home are per se unreasonable unless justified by exigent ___ __ circumstances." Moore, 790 F.2d at 15; see also Wilson, 36 F.3d _____ ________ ______ at 208. Bartelho argues that sufficient evidence did not support the district court's finding that exigent circumstances justified the officers' warrantless search. To determine whether there is an exigency sufficient to justify a warrantless search and seizure, the test is "whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant." Wilson, 36 F.3d ______ 205, 209 (1st Cir. 1994) (quoting United States v. Adams, 621 _____________ _____ F.2d 41, 44 (1st Cir. 1980)); see also Hegarty v. Somerset _________ _______ ________ -13- -13- County, 53 F.3d 1367, 1374 (1st Cir. 1995). This necessarily ______ fact-based inquiry, Wilson, 36 F.3d at 209, requires that we ______ consider factors including the gravity of the underlying offense, whether a delay would pose a threat to police or the public safety, and whether there is a great likelihood that evidence will be destroyed if the search is delayed until a warrant can be obtained. Wilson, 36 F.3d at 209-10; Baldacchino, 762 F.2d at ______ ___________ 176.  Bartelho contends that the district court erred in finding that exigent circumstances justified the officers' warrantless search. In particular, he emphasizes that John Perruzzi, the dispatcher, found the telephone line busy when he called; that Harris had already exited the building when the officers arrived; and that she provided no confirmation of an assault, the existence of a firearm, or Bartelho's presence inside the Harris-Bartelho apartment. According to Bartelho, these facts rebut the district court's finding that requisite exigent circumstances existed. The facts that Bartelho cites do not compel a finding that exigent circumstances did not exist. Bartelho tries to argue that Perruzzi interrupted Harris in the middle of a phone call, and so the police should have decided that all was well. However, we must review evidence as a whole, including all reasonable inferences, in the light most favorable to the government. See, e.g., United States v. Robles, 45 F.3d 1, 2 ___ ___ _____________ ______ (1st Cir. 1994), cert. denied, 114 S. Ct. 731, 126 L.Ed.2d 694 ____________ -14- -14- (1994). A busy signal would be consistent not only with the possibility that Harris was making a phone call, but also with the reasonable inference that Bartelho had taken the phone off the hook. Moreover, as we have previously discussed, the police were not required to take Harris' statements at face value, given her demeanor, their training regarding domestic violence, and Daigle's report. We conclude that the district court did not err in finding the requisite exigent circumstances. Several facts address the reasons that this court has previously emphasized in determining whether exigent circumstances exist. The police were summoned by a caller who identified herself, lending credibility to the report, and reported that a woman was being threatened by a man with a loaded rifle, certainly a grave offense. See 17-A ___ M.R.S.A. 1252(4) (1983 & Supp. 1994) (increasing penalties for crimes if a "dangerous weapon" is used); see also L pez, 989 F.2d ________ _____ at 26 (considering presence of a firearm used in assault as a factor in upholding warrantless search). Other facts suggest that delay would have risked public safety. The scene was near a busy highway that was on the route of a soon-to-begin Fourth of July parade. Besides the parade, there were also other dwellings nearby. Furthermore, Bartelho may well have known from Harris' conversation with the dispatcher, or from looking outside, that the police were waiting for him. By waiting, the police may have risked an ambush. See United States v. L pez, 989 F.2d 24, 26 ___ ______________ _____ (1st Cir. 1993) (noting that police are allowed to consider their -15- -15- own safety). Moreover, any normal delay in obtaining a warrant might have been exacerbated by the holiday. Guided in our inquiry by this court's previously adopted rubric, these facts lead us to uphold the district court's finding of exigent circumstances. Because we uphold the district court's finding that the July 2 search was legal, we do not consider Bartelho's argument that the July 7 search warrant was tainted by illegality. C. Jury Procedures C. Jury Procedures Bartelho also argues that the district court erred by refusing to discharge the jury panel after another case's indictment, involving the same model of firearm and an identical witness, had already been read to the panel during voir dire and jury selection. According to Bartelho, these facts may have led the jury to associate him with the defendant who faced an unrelated trial on a more serious charge. Bartelho contends that he was thus denied a fair trial. In empaneling a jury, a district court has a "duty to determine the question of actual bias, and [] broad discretion in its rulings on challenges therefor." Dennis v. United States, ______ _____________ 339 U.S. 162, 168 (1950); see also Kotler v. American Tobacco ________ ______ _________________ Co., 926 F.2d 1217, 1228 (1st Cir. 1990) (in absence of manifest ___ juror prejudice, "we will not set aside a judge's actions in empaneling a jury which [the judge] reasonably considers to be suitable and impartial"). We review a trial judge's exercise of discretion in empaneling a jury for "clear abuse." See, e.g., ___ ___ -16- -16- United States v. McCarthy, 961 F.2d 972, 976 (1st Cir. 1992); _____________ ________ United States v. Ploof, 464 F.2d 116, 118 n.4 (2d Cir. 1972). _____________ _____ Although we have been unable to find any cases squarely on point, prior cases in this circuit that address related issues lead us to reject Bartelho's argument. In United States v. ______________ Carranza, 583 F.2d 25 (1st Cir. 1978), we adopted the following ________ rule: unless a specific showing of bias or prejudice is made, the fact that a juror sat in a prior case involving the same government witnesses and the same type of crime will not be grounds for disqualification per se unless the ___ __ defendant is charged with an offense arising from the same transaction. Id. at 28. Here, Bartelho has not made a specific showing of ___ bias or prejudice. Furthermore, unlike in Carranza, his jurors ________ neither heard the witnesses nor saw the evidence against the other defendant. Additionally, Bartelho's charge (being a felon- in-possession) and the other relevant defendant's charge (bank robbery) were not the same type of crime. Finally, the similarities between Bartelho's case and the one with which his jury was empaneled are insufficient. See, e.g., United States v. ___ ___ _____________ Morales-D az, 925 F.2d 535, 537 (1st Cir. 1991) (rejecting ____________ argument of bias based on several jurors' prior service in a different case involving another Hispanic drug defendant). Thus, Bartelho has considerably less basis for an allegation of prejudice than the defendant in Carranza, who also failed to ________ persuade this court. We note in passing that this court has previously emphasized the importance of caution under the -17- -17- Carranza rule in addressing challenges that threaten the judicial ________ economy of multiple empanelment based on the negligible adverse effects of this system when properly handled, as here. United ______ States v. Maraj, 947 F.2d 520, 525 (1st Cir. 1991). ______ _____ For these reasons, we find that the district court did not abuse its discretion by not discharging the panel. -18- -18- D. Harris' Testimony on Bartelho's Death Threats D. Harris' Testimony on Bartelho's Death Threats Lastly, Bartelho challenges the district court's decision to allow Harris to testify that Bartelho had threatened to kill her. On relevance grounds, Bartelho objected to the government's questioning of Harris on redirect regarding whether Bartelho had threatened to kill her, but the court allowed the testimony. Citing Federal Rule of Evidence 403,2 Bartelho argues that although the death threat may have been relevant as to motive, such testimony was highly inflammatory and prejudicial. He contends that this testimony thereby increased the likelihood of a conviction based on emotion rather than facts, thus denying him of a fair trial. The balancing of probative value against prejudicial impact under Rule 403 will not be disturbed on appeal as long as the trial court "does not stray entirely beyond the pale." United States v. Rodr guez-Estrada, 877 F.2d 153, 156 (1st Cir. _____________ _________________ 1989) (quoting United States v. Tierney, 760 F.2d 382, 388 (1st _____________ _______ Cir. 1985)). We review the trial court's ruling only for abuse of discretion, see Tierney, 760 F.2d at 388, bearing in mind that ___ _______ the limitations of Rule 403 are to be "rarely invoked." United ______ States v. Zeuli, 725 F.2d 813, 816 (1st Cir. 1984). ______ _____  ____________________ 2 It is not entirely clear from the record that a Rule 403 issue has been preserved for appeal. The government contends that Bartelho tacitly waived a Rule 403 objection via his later objections. Nonetheless, the ambiguity is irrelevant here, since we do not consider the issue of waiver, as Bartelho's argument fails on other grounds. -19- -19- We uphold the district court's decision to allow the testimony. Harris was the only government witness who could testify that Bartelho actually had physical possession of the weapon. In fact, before trial she had so testified, and had been recorded on tape. However, at trial she denied that Bartelho had had a gun. Given that she was the best witness to one of the elements of the crime of felon-in-possession, evidence that Bartelho had previously threatened her life was highly relevant to the jury's decision whether to credit her taped version of the facts or her conflicting trial testimony. Furthermore, only the fact that Harris told others about the threats was elicited; there were no sensational details. Thus, we conclude that the district court did not abuse its discretion in admitting the evidence of the threats. For the foregoing reasons, the judgment of the district court is affirmed. affirmed. ________ -20- -20-