<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 99-1377

                         LORI FLETCHER,

                      Plaintiff, Appellee,

                     
                               v.

         TOWN OF CLINTON, DEAN BESSEY, and TODD GENEST,

                    Defendants, Appellants.

                                 
         APPEAL FROM THE UNITED STATES DISTRICT COURT
                                
                  FOR THE DISTRICT OF MAINE
                                
       [Hon. Eugene W. Beaulieu, U.S. Magistrate Judge]
                                
                                
                                
                                
                            Before
                                
                     Stahl, Circuit Judge,
            John R. Gibson, Senior Circuit Judge,
                  and Lynch, Circuit Judge.
                                
                                
                                
                                
 Edward R. Benjamin, Jr., with whom Thompson & Bowie was
on brief, for appellants.
 C.H. Spurling for appellee.  

November 8, 1999

 LYNCH, Circuit Judge.  On July 17, 1997, Lori Fletcher
obtained an ex parte domestic violence restraining order against
her abusive boyfriend, William McDonald.  McDonald was ordered to
stay away from Fletcher and her residence.  Informed that McDonald
had been seen in Fletcher's home recently, two Clinton, Maine
police officers drove by her house on July 31, 1997.  They saw
McDonald there.  Aware of the restraining order and past occasions
on which Fletcher sought police help, the police entered her home,
despite her objections and her assertion that McDonald was not in
the house.  A fracas resulted during which Fletcher was arrested
and McDonald escaped.  McDonald turned himself in the next day.  No
charges were ever prosecuted against Fletcher.
 Fletcher then brought a federal civil rights action
against the officers, the Town, and the bail commissioner.  A
Magistrate Judge denied the defendants' motion for summary judgment
on the grounds of qualified immunity, and they appeal.  We affirm
in part and reverse in part, hold that the officers have qualified
immunity as to Counts I and II of the complaint, and find the
defendants have waived their appeal from the denial of immunity as
to Count III.  We vacate the Magistrate Judge's denial of summary
judgment as to the Town of Clinton, and remand for further
proceedings.

                              I
 Fletcher filed suit against police officers Dean Bessey
and Todd Genest, bail commissioner William Cyr, and the Town of  
Clinton, Maine on May 15, 1998, alleging violations of 42 U.S.C.
1983 and state tort and criminal laws.  Count I of the complaint
alleges violations of  1983 stemming from the officers' first
entry into her home and her subsequent arrest; Count II concerns
the officers' second entry into her home that night and "her
subsequent detention and interrogation."  Finally, Count III
alleges a  1983 violation stemming from the bail process.  
 The Magistrate Judge denied the motion for summary
judgment as to the officers and the Town, concluding that the
officers violated Fletcher's clearly established Fourth Amendment
rights in circumstances in which no reasonable officer could have
believed that his or her actions were not in violation of such
rights.  In concluding that there were no exigent circumstances
justifying the officers' actions, the Magistrate Judge relied on
the officers' "lack of haste" in going to Fletcher's home after
hearing that McDonald had been seen there earlier, the lack of a
history of physical violence in the pair's relationship, and the
fact that the police "saw nothing to suggest Plaintiff was in
danger" that evening.
                              II
 We briefly address the question of appellate
jurisdiction.  Fletcher argues that this court is without
jurisdiction to hear the defendants' appeal, as that appeal is
"based on allegations of factual error by the court below."  
 The jurisdictional rules in this area are clear.  
Ordinarily, appeals from denials of summary judgment will not be
entertained.  See Buenrostro v. Collazo, 973 F.2d 39, 41 (1st Cir.
1992).  There is, however, a narrow exception for denials of
pretrial motions based on claims of qualified immunity.  See
Johnson v. Jones, 515 U.S. 304, 311-12 (1995).  Such denials are
reviewable "only to the extent that the qualified immunity defense
turns upon a 'purely legal' question."  Daz v. Daz Martnez, 112
F.3d 1, 3 (1st Cir. 1997); see also Tang v. Rhode Island, 120 F.3d
325, 326 (1st Cir. 1997).  "[A] district court's pretrial rejection
of a qualified immunity defense is not immediately appealable to
the extent that it turns on either an issue of fact or an issue
perceived by the trial court to be an issue of fact."  Daz, 112
F.3d at 3 (quoting Stella v. Kelley, 63 F.3d 71, 74 (1st Cir.
1995)) (internal quotation marks omitted).
 Fletcher is correct that there would be no appellate
jurisdiction here if summary judgment were properly denied because
there were material facts in dispute.  Fletcher is also correct
that there are disputes of fact concerning many of the details of
the events in question.  But the Magistrate Judge clearly based his
decision on a determination that summary judgment was not available
as a matter of law.  See id. ("If the pretrial rejection of the
qualified immunity defense is based on a purely legal ground, such
as a finding that the conduct described by the plaintiff, assuming
it occurred, transgressed a clearly established right, then the
denial may be challenged through an interlocutory appeal.").  Our
independent review of the record shows that the disputed facts are
not material and that the issue of immunity may properly be decided
on the basis of the undisputed facts.
                             III
 The essentials of the event are undisputed.  We view the
facts in the light most favorable to Fletcher.  See Swain v.
Spinney, 117 F.3d 1, 8 (1st Cir. 1997).
 Before the night of July 31, 1997, Fletcher had called
the police for help with McDonald three separate times before she
obtained a restraining order.  On May 22, 1997, Fletcher called the
police and complained that McDonald was extremely angry, was
refusing to leave her home, and had thrown her kitten across her
apartment.  Officer Genest went to Fletcher's home, where Fletcher
told him that things were now under control.  A pastor from
Fletcher's church had arrived and McDonald had agreed to leave with
him.  The police left once McDonald did.
 About two weeks later, on June 6, 1997, Fletcher called
the police again.  She told the dispatcher that McDonald was drunk,
had refused to leave, and was stealing her property and threatening
to damage her car.  The dispatcher heard McDonald tell Fletcher to
hang up the phone and call someone to come pick him up; the
dispatcher urged Fletcher to stay on the line until officers
arrived.  The dispatcher heard an escalating argument and got
McDonald on the phone.  Officers Genest and Bessey arrived shortly
thereafter and found McDonald outside the home.  Despite their
orders not to do so and their warnings of arrest if he persisted,
McDonald tried to go back into Fletcher's home.  McDonald was
arrested and charged with criminal trespass.  McDonald was later
released on bail on the condition that he not have any direct or
indirect contact with Fletcher or her home.
 On July 16, 1997, Fletcher again called the police, this
time from the home of Clinton Police Sergeant Steve Trahan (or his
mother).  Fletcher said that her "ex-boyfriend" McDonald was in her
home in violation of his bail conditions and that she had been
forced to flee to call for help.  Fletcher told the police that
McDonald had been at her home when she returned from work, that
they had argued, and that Fletcher had fled to her car.  She was
talking to McDonald's ex-girlfriend (who had called to speak with
McDonald) on her cordless phone.  McDonald had been "screaming in
the background."  When Fletcher asked McDonald's ex-girlfriend to
call for help, McDonald had grabbed the phone away and thrown it
into a field.  Fletcher went for help and the ex-girlfriend called
the police.  Fletcher did not know Sergeant Trahan, but she had
seen a police car parked outside of the house and was "just taking
a chance hoping someone was there that could help [her]."
 Officers picked up Fletcher and took her home.  McDonald
was gone.  They saw that McDonald had damaged Fletcher's property,
and noted that her kitten's eye was swollen shut.  McDonald
telephoned Fletcher while the police were with her; he told her
that he was in Fairfield, Maine.  It was a ruse.  When the police
left to find him, McDonald appeared outside of Fletcher's house.  
Fletcher once again called the police.  McDonald was arrested later
that evening, his bail was revoked, and he was returned to jail.   
 The next day, July 17, Fletcher applied for an ex parte
temporary restraining order against McDonald in the state district
court.  Under Maine law at the time, temporary ex parte orders of
protection could be granted on a showing of "[i]mmediate and
present danger of physical abuse to the plaintiff."  Me. Rev. Stat.
Ann. tit. 19,  765(2).  In her application, Fletcher swore that
she was "in immediate and present danger of abuse by the
defendant."  She described the previous day's events -- the same
events she had described to the police the night before -- and
reported that she had "called for help on previous occassions [sic]
because [she] was freightened [sic] for [her] safety and for the
safety of [her] property."  Fletcher also told the court that
McDonald had "threatened [her] on several occassions, [sic] that if
I leave him he will wreck my car and my belongings."  The court
issued an order that prohibited McDonald from, among other things,
entering Fletcher's home and having any contact, direct or
indirect, with her.  The order was served on McDonald in jail.  A
copy was also delivered to the Clinton Police Department, as the
agency responsible for enforcing the order.
 On the evening of July 31, 1997, the date of the
incidents in question, Officers Genest and Bessey went on duty at
6 p.m.  Shortly before going on duty, Trahan informed Genest that
he had seen McDonald at Fletcher's home, when Fletcher was not
there, earlier in the day or the day before.  Both Genest and
Bessey were aware of the history of problems between Fletcher and
McDonald.  Genest had responded to Fletcher's May 22 and June 6
calls for help, and Bessey had responded to the June 6 call.  
Additionally, both officers were aware of the events of July 16 and
knew that Fletcher had obtained a restraining order against
McDonald.  Before leaving the station, Genest called the Kennebec
County Sheriff's Office and was informed that the restraining order
was still in effect.
 At approximately 9 p.m. that evening, the officers drove
past Fletcher's home.  As they drove by, they both saw a man they
recognized as McDonald through a first floor window.  He was
standing in Fletcher's bedroom and talking to her.
 The officers did not see any sign of conflict between
Fletcher and McDonald.  Their prior experiences with McDonald as
well as their knowledge that a protective order existed made them
concerned for Fletcher's safety, however.  As Genest stated in his
affidavit, "[i]t was apparent to me that the situation had
escalated to the point that Ms. Fletcher feared for her safety to
the point of repeatedly calling for police assistance and obtaining
a court order prohibiting Mr. McDonald from having any contact with
her or her property."  Bessey reacted similarly, concluding that
Fletcher's life was in danger because of "Mr. McDonald's violent
nature," "Mr. McDonald's drinking, her calling us, calling the
county, [and] her putting a protection order on him."  The officers
turned their cruiser around and stopped briefly to contact Trahan.  
Trahan once again confirmed that the restraining order was in
effect and told them to pick up McDonald and bring him in.   
 On returning to Fletcher's home, Bessey knocked on the
front door while Genest went to the window where they had seen
Fletcher and McDonald earlier "to ensure that McDonald did not harm
Fletcher" and to "watch McDonald in case he tried to flee."  When
Genest approached the window, he saw Fletcher in her bedroom.  
Although Bessey's knocking was audible in the bedroom and although
Fletcher had seen the police cruiser outside, she ignored the
knocking at her door.  Speaking through her window, Genest told
Fletcher that he was from the Police Department, that he knew
McDonald was in the home, and that she should go to the door.  He
said that he would arrest her if she did not.  She denied that
McDonald was there.
 Genest and Bessey say that Fletcher eventually went to
the door and opened it.  Fletcher, in contrast, says that she never
opened the door, but that the officers let themselves in through
the front door, which might have been locked.  We will take
Fletcher's version of events.
 Once inside, the officers saw Fletcher and told her that
they were looking for McDonald and knew he was in her home.  
Fletcher denied that McDonald was there, said that a friend of hers
was in the bathroom, and ordered the officers to leave.  McDonald
spoke from behind the bathroom door, saying he was someone else.  
The ploy backfired.  The officers immediately recognized McDonald's
distinctive accent.
 Bessey observed that Fletcher "acted kind of shook up and
wanted us to leave" and that it seemed as though "Mr. McDonald was
directing Ms. Fletcher to request that we leave the residence."  
Genest knew that McDonald had interfered with Fletcher's attempts
to get help on a previous occasion and said that he "did not know
if that was the case in this situation, or whether Mr. McDonald had
threatened to harm Ms. Fletcher if she told us he was in the
apartment and had him arrested."
 The officers decided to go further inside the house.  As
they moved toward the bathroom, Fletcher picked up the phone and
dialed 911.  Genest took the phone from her hand, told the
dispatcher who he was, and explained that no assistance was needed
at that time.  He hung up the phone and the officers went to the
bathroom door.  Fletcher stayed close to the officers, demanding
they leave and insisting that they had no legal right to be there.  
Fletcher was warned that she would be arrested if she did not stop
interfering with their efforts to reach McDonald.  She continued
and Genest handcuffed her and placed her in the bedroom.
 The officers eventually got the bathroom door open.  
After a struggle with McDonald, the officers sprayed pepper spray
into the bathroom and McDonald slammed the door closed, leaving the
officers outside.  When the officers opened the door after waiting
for the pepper spray to clear, they found McDonald had escaped out
the bathroom window.  Both officers left the house to pursue
McDonald.
 As Genest left the house, he heard the door close and
lock behind him.  Fearing that McDonald had reentered the home and
knowing that Fletcher was vulnerable in her handcuffed position,
Genest returned to the front door, found it locked, and shouted a
demand that the door be opened.  Fletcher did not hear Genest's
demand.  When there was no response, Genest kicked the door in.  He
discovered that Fletcher had slipped out of her handcuffs and that
she was the one who had locked the front door.  She had again
called 911, and Genest again removed the phone from her hand and
spoke to the dispatcher.  Genest then handcuffed Fletcher and took
her to the police cruiser.
 Meanwhile, Bessey had not found McDonald.  Genest radioed
for assistance and the officers who reported to the scene proceeded
to search for McDonald.  They did not find him.
 Fletcher was eventually taken by Genest and Bessey to the
police station, where she waited until the bail commissioner
arrived.  Fletcher was released on bail that evening.  No charges
were ever prosecuted against Fletcher.  McDonald turned himself in
the next day, and was released on bail.  He eventually pled guilty
to violation of the protective order.
                              IV
 We review the grant or denial of summary judgment de
novo.  See Swain, 117 F.3d at 5.  Qualified immunity analysis is
two-pronged.  "First, the court must establish whether the
constitutional right asserted by the plaintiff was 'clearly
established' at the time of the alleged violation."  St. Hilaire v.
City of Laconia, 71 F.3d 20, 24 (1st Cir. 1995).  Under this prong,
"[t]he contours of the right must be sufficiently clear that a
reasonable official would understand that what he is doing violates
that right."  Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640
(1987)) (internal quotation marks omitted).  Second, the court must
ascertain "whether a reasonable official situated in the same
circumstances should have understood that the challenged conduct
violated that established right."  Id. (quoting Hegarty v. Somerset
County, 53 F.3d 1367, 1373 (1st Cir. 1995)) (internal quotation
marks omitted).  This is an objective inquiry that involves asking
"whether the agents acted reasonably under settled law in the
circumstances, not whether another reasonable, or more reasonable,
interpretation of the events can be constructed . . . after the
fact."  Hunter v. Bryant, 502 U.S. 224, 228 (1991) (per curiam).  
We analyze this case under the second prong.
A.  The Warrantless Entry Claims
 Fletcher claims that both the initial entry into her home
and the reentry after McDonald had escaped through the bathroom
window violated her Fourth Amendment rights.  Both entries were
without warrant and we evaluate these claims together.
 It is clearly established that a search warrant is
ordinarily required to enter the home of a third person to arrest
an individual who is believed to be inside the home.  See Steagald
v. United States, 451 U.S. 204, 216 (1981).  This rule applies
regardless of the existence of an arrest warrant.  See id.  Just as
clearly established, however, is the "exigent circumstances"
exception to this rule.  See Joyce v. Town of Tewksbury, 112 F.3d
19, 21-22 (1st Cir. 1997) (en banc).  Exigent circumstances exist
where "there is such a compelling necessity for immediate action as
will not brook the delay of obtaining a warrant."  United States v.
Almonte, 952 F.2d 20, 22 (1st Cir. 1991) (quoting United States v.
Adams, 621 F.2d 41, 44 (1st Cir. 1980)) (internal quotation marks
omitted).   
 There are four recognized categories of exigent
circumstance: "(1) 'hot pursuit' of a fleeing felon; (2) threatened
destruction of evidence inside a residence before a warrant can be
obtained; (3) a risk that the suspect may escape from the residence
undetected; or (4) a threat, posed by a suspect, to the lives or
safety of the public, the police officers, or to herself."  
Hegarty, 53 F.3d at 1374.  The defendants say that "safety"
exigencies justified their warrantless entries into Fletcher's
home.  
 An officer's reasonable belief that the delay needed to
obtain a warrant would pose "a threat to police or the public
safety" is sufficient to create exigent circumstances.  United
States v. Curzi, 867 F.2d 36, 42 (1st Cir. 1989) (internal
quotation marks and citation omitted).  "[T]he Supreme Court's
standard of reasonableness is comparatively generous to the police
in cases where potential danger, emergency conditions or other
exigent circumstances are present."  Roy v. Inhabitants of
Lewiston, 42 F.3d 691, 695 (1st Cir. 1994).  Fletcher, ably
represented, argues that the police were required to obtain a
warrant because it was unreasonable to conclude that her safety was
threatened.
 To the extent that the decision below rested on the
ground that the officers did not see McDonald being violent toward
Fletcher, that ground alone is inadequate to deny immunity.  
Evidence of extreme danger in the form of shots fired, screaming,
or blood is not required for there to be some reason to believe
that a safety risk exists.  See Tierney v. Davidson, 133 F.3d 189,
198 (2d Cir. 1998) ("[T]he absence of blood, overturned furniture
or other signs of tumult" did not render the officer's belief that
danger existed unreasonable and did not require the officer "to
withdraw and go about other business, or stand watch outside the
premises listening for the sounds of splintering furniture.");
United States v. Brown, 64 F.3d 1083, 1086 (7th Cir. 1995) ("We do
not think that the police must stand outside an apartment, despite
legitimate concerns about the welfare of the occupant, unless they
can hear screams.  Doubtless outcries would justify entry, but they
are not essential." (citation omitted)).
 On the spot reasonable judgments by officers about risks
and dangers are protected.  Deference to those judgments may be
particularly warranted in domestic disputes.  In those disputes,
violence may be lurking and explode with little warning.  Domestic
violence victims may be intimidated or suffer from a dependence
inherent in the abusive relationship.  The signs of danger may be
masked.  See generally State v. Greene, 784 P.2d 257, 259 (Ariz.
1989) (en banc) (noting that domestic violence calls "commonly
involve dangerous situations in which the possibility for physical
harm or damage escalates rapidly"); S. Rep. No. 102-197, at 38
(1991) (noting that "fear of retaliation and the lingering stigma
of sex crimes and violence in the home" mean that "[b]oth literally
and figuratively, these crimes remain hidden from public view");
Charles Patrick Ewing, Battered Women Who Kill 19 (1987) (noting
that battered women often form a "traumatic bond" with their
abusers, which leads them to become "extremely dependent" on their
abuser and makes them "more incapable of fending for themselves");
Bureau of Justice Statistics, U.S. Dep't of Justice, Rep. No. NCJ-
167237, Violence by Intimates at v (1998) (noting that one of the
"most common reasons given by victims for not contacting the
police" was that they "feared retaliation").  Maine has had many
episodes of domestic disputes turning violent and even fatal.  See
Maine Coalition for Family Crisis Services, Domestic Abuse in
Maine: Data Project 1990-1995, at 26 (n.d.) (finding that 51% of
all homicides in Maine from 1990-1995 were "domestic violence
related").
 Police must often make balanced choices.  Domestic
violence situations require police to make particularly delicate
and difficult judgments quickly.  See Tierney, 133 F.3d at 197
("Courts have recognized the combustible nature of domestic
disputes, and have accorded great latitude to an officer's belief
that warrantless entry was justified by exigent circumstances when
the officer had substantial reason to believe that one of the
parties to the dispute was in danger.").  At the same time,
officers must respect basic freedoms guaranteed by the Fourth
Amendment.  A person's home is her sanctuary, not ordinarily to be
entered by the police unless that entry is authorized by a warrant.  
See Payton v. New York, 445 U.S. 573, 585-87 (1980).  This is true,
even when the officers want to enter the home in order to arrest a
third person whom they believe is there.  See Steagald, 451 U.S.
at 216.  Victims of domestic violence do not give up their
constitutional rights or the sanctity of their homes as the price
for obtaining a restraining order against an abuser.
 The balanced choice the officers must make is protected
by qualified immunity if it is an objectively reasonable one.  The
officers here chose not to seek a warrant, which inevitably would
have caused delay.  If their choice not to delay but to enter
Fletcher's home was an objectively reasonable one, then the
officers receive the protection of qualified immunity.  Such
immunity is given not only for the protection of the officers, but
also to protect victims of crime.  In the domestic violence
context, immunity is given so that officers will not have strong
incentives to do nothing when they believe a domestic abuse victim
is in danger.  Permitting suit against officers who have acted
reasonably when there is reason to fear would create exactly the
wrong incentives.  Indeed, if the officers had done nothing, and
Fletcher had been injured, they would have faced the threat of
suit.  In either event, their choice would be protected if it was
objectively reasonable in light of clearly settled law.
 Officers' decisions to enter a home to ensure the safety
of those believed to be at risk of domestic violence have been
found reasonable by other courts.  Cf. United States v. Gwinn, 46
F. Supp. 2d 479, 482-83 (S.D. W. Va. 1999) (finding entry to be
reasonable, even though alleged abuser had been detained, because
alleged victim was crying and might have needed assistance);
Greene, 784 P.2d at 259 ("The call [to 911] itself creates a
sufficient indication that an exigency exists allowing the officer
to enter a dwelling if no circumstance indicates that entry is
unnecessary."); State v. Lynd, 771 P.2d 770, 773 (Wash. Ct. App.
1989) (concluding that entry was reasonable where there had been a
hang-up call to 911 and the husband, who was outside the house,
reported that he and his wife had been arguing).
 In this case, Fletcher's arguments -- that the officers'
belief that there was a threat to her safety was unreasonable -- do
have some weight.  The officers saw no violence occurring within
the home.  Fletcher clearly told the officers that she did not want
them in her home that night.  McDonald had not been physically
violent with Fletcher, Fletcher had not hesitated to call the
police when she felt in danger, and the officers saw no evidence of
violence.  Despite these facts, the officers intervened, and
Fletcher, who had sought the protection of the law, was the one
arrested.  But Fletcher's subjective view of the facts is not the
test.  We conclude that an objectively reasonable officer, facing
the circumstances that Genest and Bessey faced that evening, could
have concluded that both of the warrantless entries into Fletcher's
home were justified by the threat to Fletcher's safety.  
 It was reasonable to conclude that Fletcher was at risk.  
The sequence of events described earlier -- three calls to the
police, a protective order, McDonald's being jailed -- could easily
lead the officers to the conclusion that Fletcher was at risk on
the night of July 31, indeed at greater risk than she had been
previously.  There was good reason to believe that McDonald might
well be vindictive and try to hurt Fletcher for having him arrested
on July 16 and sending him back to jail.  Fletcher's own testimony
was that she sought the protective order because she felt that the
situation might escalate dangerously.
   I was afraid that he would come back to my apartment when
 he did get out of jail and be very, very upset that they
 had arrested him and tried [sic] to blame it on me. . . .
 I was afraid that he could hurt me because -- he had
 never hurt me, but he had hurt people in the past and he
 had thrown my kittens, so, yes, I was afraid.

 Fletcher's fear was well-founded.  Arrests, protective
orders, and other attempts to break the cycle of violence often
increase the short-term danger to abuse victims.  See Women and
Violence: Hearings before the Comm. on the Judiciary, U.S. Senate,
on Legislation to Reduce the Growing Problem of Violent Crime
Against Women, 101st Cong. 2d 145 (1991) (statement of Susan Kelly-
Dreiss, Executive Director, Pennsylvania Coalition Against Domestic
Violence); Ewing, supra, at 13 ("Violence against battered women
often escalates any time they attempt to take any control over
their lives or the battering relationship."); Lenore E. Walker et
al., Beyond the Juror's Ken: Battered Women, 7 Vt. L. Rev. 1, 12
(1982) ("One of the most dangerous times for both partners is at
the point, or threat, of separation.").  The officers also knew
that McDonald was in violation of both the protective order and his
bail conditions.  His defiance of court orders, at the risk of
going back to jail, suggested a man out of control or bent on
revenge.  
 Fletcher's refusal to admit the officers and her denial
that McDonald was in the home did not make the officers' conclusion
that her safety was threatened unreasonable.  Instead of opening
the door and telling the officers that McDonald was there with her
permission and was not threatening her safety, Fletcher ignored the
knocking at her door and later lied about McDonald's presence.  
This gave them additional reason to fear for her safety, given
their knowledge that McDonald had previously interfered with
Fletcher's efforts to contact the police.  In domestic violence
situations, officers may reasonably consider whether the victim is
acting out of fear or intimidation, or out of some desire to
protect the abuser, both common syndromes.  See United States v.
Bartelho, 71 F.3d 436, 438 (1st Cir. 1995) (noting that officers
are often trained not to take the statements of abuse victims at
face value, but instead to consider whether the victims are acting
out of fear).  Indeed, one commentator has estimated that domestic
violence victims are uncooperative in eighty to ninety percent of
attempted criminal prosecutions against their batterers.  See Lisa
Marie De Sanctis, Bridging the Gap Between the Rules of Evidence
and Justice for Victims of Domestic Violence, 8 Yale J.L. &
Feminism 359, 367-68 (1996).  This same commentator concluded that
victims often lie "to minimize the violence and protect the
batterer."  Id. at 392 n.197; see also Mary Ann Dutton,
Understanding Women's Responses to Domestic Violence: A
Redefinition of Battered Woman Syndrome, 21 Hofstra L. Rev. 1191,
1232-35 (1993).  Particularly given their knowledge of the prior
incidents between Fletcher and McDonald, the officers were not
required to accept Fletcher's statements.  Thus, the officers are
entitled to qualified immunity as to the first entry.
 The officers' second entry into Fletcher's home was also
justified by the exigencies of the situation.  When Genest entered
Fletcher's home the second time, he knew that someone had locked
him out.  It was reasonable for him to believe that McDonald might
have done so by reentering the home.  And he knew that if McDonald
had reentered the house, Fletcher would be vulnerable in her
handcuffed position.  Further, the situation had, at this point,
escalated, increasing the possibility that McDonald might engage in
violence.
 The Magistrate Judge, in denying summary judgment, found
that the officers' "lack of haste" meant that exigent circumstances
did not exist to justify the entries.  In particular, he relied
upon the fact that the officers learned around 6 p.m. that McDonald
had been seen at Fletcher's home sometime in the last day or two,
but did not go by her house until approximately 9 p.m.  This
analysis ignores the fact that these officers did not themselves
have any information that McDonald was still at the house and,
thus, that Fletcher was in danger until they drove past her house
at 9 p.m.  At that point, they delayed only briefly to confirm that
the protective order was in effect and to receive instructions from
Trahan as to how they should proceed.  The information that they
received before they went on duty that evening -- that McDonald had
been seen in Fletcher's home, when she was not there, at some time
during the last two days -- did not create an exigency.  The
exigent circumstances arose when Genest and Bessey saw McDonald in
the house with Fletcher, and they did not delay unreasonably in
acting to address the safety risk they perceived at that time.  See
United States v. Rengifo, 858 F.2d 800, 804 (1st Cir. 1988) ("An
agent does not avoid or delay applying for a warrant if he or she
is conducting an investigation spurred by suspicion, but without,
in her reasonable judgment, sufficient evidence to establish
probable cause to support a warrant.").
 The officers are entitled to qualified immunity as to
both entries, and thus to dismissal of these claims in Count I and
Count II.
B.  The Warrantless Arrests
 Count I and Count II also allege that Fletcher's Fourth
Amendment rights were violated when Genest arrested her.  The gist
of the complaint seems to be that Genest lacked probable cause to
arrest Fletcher and to charge her with hindering apprehension and
escape.  This question is somewhat closer than the wrongful entry
claim.    
 The law in this area is also clear.  Warrantless arrests
are permissible when supported by probable cause.  See Rivera v.
Murphy, 979 F.2d 259, 263 (1st Cir. 1992).  In turn, "probable
cause exists when the facts and circumstances within [the police
officers'] knowledge and of which they had reasonably trustworthy
information were sufficient to warrant a prudent [person] in
believing that the [defendant] had committed or was committing an
offense."  Id. (quoting United States v. Figueroa, 818 F.2d 1020,
1023 (1st Cir. 1987)) (internal quotation marks omitted)
(alterations in original).  Again, we turn to the second prong of
the immunity analysis -- whether an objectively reasonable officer
would have found probable cause for the arrest.
 Police are afforded immunity "so long as the presence of
probable cause is at least arguable."  Floyd v. Farrell, 765 F.2d
1, 5 (1st Cir. 1985).  Under this standard, Genest's arrest of
Fletcher for hindering apprehension, while questionable, is not so
unreasonable as to deprive him of qualified immunity.  Fletcher's
conduct brought her within the literal terms of Maine's hindering
apprehension statute:
   1.  A person is guilty of hindering apprehension or
 prosecution if, with the intent to hinder, prevent or
 delay the discovery, apprehension, prosecution,
 conviction or punishment of another person for the
 commission of a crime, he:

 A.  Harbors or conceals the other person; or

 . . .  

 E.  Obstructs by force, intimidation or deception anyone  
   from performing an act which might aid in the discovery,
 apprehension, prosecution or conviction of such
 person . . . .   
Me. Rev. Stat. Ann. tit. 17-A,  753.  Fletcher's own testimony is
that she lied to the officers and said McDonald was not in the
house or in the bathroom.  Her actions, therefore, fit within the
statutory language.  
 It is important to note that Fletcher's refusal to let
the officers into her house cannot serve as the justification for
her arrest.  Fletcher says that Genest threatened her with arrest
if she denied them access to the house so that they could arrest
McDonald.  If that were the justification for Fletcher's arrest,
that arrest would be in clear violation of the Fourth Amendment.  
That is not this case, however.
 Fletcher also complains that the officers lacked probable
cause to arrest her for escape, which requires that she "without
official permission . . . intentionally leaves official
custody . . . ."  Me. Rev. Stat. Ann. tit. 17-A,  755(1).  This
charge was based on Fletcher's slipping out of the handcuffs and
locking the door behind the officers.  While it is unclear
precisely when Genest charged Fletcher with the crime of escape, it
is clear that this charge was made sometime after Fletcher was
handcuffed for the second time.  But we need not consider whether
the officers had probable cause to arrest Fletcher for escape.  In
handcuffing Fletcher for the second time, Genest was doing no more
than bringing her back into lawful custody.  Her initial arrest for
hindering apprehension was supported by probable cause and Fletcher
has not provided, nor have we found, any cases suggesting that a
later charge may in any way affect the lawfulness of the initial
arrest.  Cf. 1 Wayne R. LaFave & Jerold H. Israel, Criminal
Procedure  3.5, at 243 (1984) (stating generally that "the
lawfulness of the arrests should be determined upon the basis of
the facts at hand when they were made and not because of the
characterization employed"); Sheehy v. Town of Plymouth, No. 98-
2080, 1999 WL 685670, at *1 (1st Cir. Sept. 8, 1999).  The charge
of escape did not result in a violation of her clearly established
constitutional rights, and the officers are, therefore, protected
by qualified immunity.  
C.  The Bail Proceedings
 Count III of Fletcher's complaint alleges constitutional
violations stemming from the process by which her bail conditions
were determined.  The defendants have not challenged on appeal the
Magistrate Judge's denial of summary judgment on this Count.  
Defendants stated at oral argument that they did not consider the
Magistrate Judge to have issued a final ruling on this portion of
their motion for summary judgment because the opinion's legal
analysis focused almost entirely on the officers' qualified
immunity as to the claimed Fourth Amendment violations.  
Regardless, the Magistrate Judge clearly disposed of the summary
  judgment motion as to Count III, stating in his opinion that
"Defendants' Motion for Summary Judgment is hereby GRANTED as to
Counts IV through IX, and DENIED as to Counts I through III."  
Thus, the defendants have waived their right to appeal the denial
of qualified immunity as to Count III.  See United States v. Slade,
980 F.2d 27, 30 n.3 (1st Cir. 1992) ("[T]heories neither briefed
nor argued on appeal are deemed to have been waived.").
D.  The Municipal Defendant
 The Town of Clinton also appeals from the denial of
summary judgment.  The Town seems to assume that it either has
qualified immunity or gets the benefit of the individual officers'
qualified immunity.  The Magistrate Judge took a similar approach,
dismissing the Town's motion for summary judgment by relying on his
qualified immunity analysis.   
 Fletcher does not make a separate argument of lack of
jurisdiction over the Town's appeal.  If, of course, the denial of
summary judgment was based on immunity grounds, there would be
appellate jurisdiction.  But both the Magistrate and Town are wrong
to view this in immunity terms.
 To the extent there is a question as to whether we have
appellate jurisdiction, we exercise very limited pendent
jurisdiction.  Both the parties and the Magistrate Judge
demonstrate that the decision on the Town's motion for summary
judgment was "inextricably intertwined with that court's decision
to deny the individual defendants' qualified immunity motions."  
Swint v. Chambers County Comm'n, 514 U.S. 35, 51 (1995); see also
Mattox v. City of Forest Park, 183 F.3d 515, 524 (6th Cir. 1999).  
Because pendent jurisdiction is discouraged, see, e.g., Roque-
Rodriguez v. Lema Moya, 926 F.2d 103, 105 & n.2 (1st Cir. 1991)
(noting that restrictions on pendent jurisdiction are "self-
imposed" and mean that "interlocutory review of a qualified
immunity order does not in and of itself confer jurisdiction over
other contested issues in the case"), we assume jurisdiction over
this claim only to vacate the Magistrate Judge's denial of the
Town's motion for summary judgment and remand for full
consideration of the issues raised by the Town's motion.
 The Magistrate Judge's resolution of the officers'
request for qualified immunity did not dispose of the Town's motion
for summary judgment.  A municipality's position in a  1983 suit
differs from that of the individual defendants in two key ways.  
First, the municipality enjoys no immunity from damages liability
under  1983.  See Owen v. City of Independence, 445 U.S. 622, 657
(1980).  This means that it is "not impossible for a municipality
to be held liable for the actions of lower-level officers who are
themselves entitled to qualified immunity."  Joyce, 112 F.3d at 23.  
Second, a municipality cannot be held liable under a respondeat
superior theory.  See Monell v. Department of Social Servs., 436
U.S. 658, 691 (1978).  This means that even if the individual
defendants are liable, the municipality may not be.  Something more
than liability on the part of the individual defendants must be
shown to impose liability on the municipality.  A plaintiff seeking
damages against the municipality must show that "the action that is
alleged to be unconstitutional implements or executes a policy
statement, ordinance, regulation, or decision officially adopted
and promulgated by [the municipality's] officers" or is "pursuant
to governmental 'custom' even though such a custom has not received
formal approval through the body's official decisionmaking
channels."  Id. at 690, 691.  If the allegation against the
municipality involves a failure to train, the plaintiff must put
forth evidence of a failure to train that amounts to "deliberate
indifference to the rights of persons with whom the police come
into contact."  City of Canton v. Harris, 489 U.S. 378, 388 (1989).  
Finally, plaintiffs must show a direct causal link between the
municipal action and the deprivation of federal rights.  See Board
of the County Comm'rs v. Brown, 520 U.S. 397, 404 (1997).
 For these reasons, motions for summary judgment brought
by individual defendants and municipalities often involve distinct
legal issues.  This is particularly true when, as in this case, the
resolution of the officers' claim for qualified immunity hinges on
a court's decision that the law was clearly established at the
time.  While a finding that the law was not clearly established may
foreclose municipal liability for failure to train, see Joyce, 112
F.3d at 23, a finding that the law was clearly established does not
dispose of the municipality's motion for summary judgment.  Rather,
the court must go on to consider whether allegations of a municipal
policy or practice have been made that are sufficient to survive
summary judgment.
 The Magistrate Judge incorrectly conflated the issues
involved in the motion for summary judgment brought by the Town and
the individual defendants.  We vacate the denial of summary
judgment as to the Town and remand for consideration of the
remaining issues.
                              V
 Accordingly, we affirm in part and reverse in part the
Magistrate Judge's denial of the motion for summary judgment as to
the individual defendants, and instruct that Counts I and II
against the officers be dismissed.  We vacate the denial of the
Town's motion for summary judgment and remand for proceedings
consistent with this decision.

</body>

</html>